

___ FILED        ___ RECEIVED
___ ENTERED      ___ SERVED ON
                 COUNSEL/PARTIES OF RECORD

AUG 3 0 2017

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: _____ DEPUTY

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

|  |  |
|---|---|
| WINECUP GAMBLE, INC., | |
| Plaintiff, | 3:17-cv-00163-RCJ-VPC |
| vs. | **ORDER** |
| GORDON RANCH LP, | |
| Defendant. | |

This is a consolidated action for declaratory relief arising from a contract for the sale of real property. Now pending before the Court are a Motion for Summary Judgment, (Mot. Summ. J., ECF No. 33), and a Cross-Motion for Judgment on the Pleadings, (Mot. J. Pleadings, ECF Nos. 36, 37). The parties have also filed two Motions to Seal. (ECF Nos. 35, 45.)

## I.  FACTS AND PROCEDURAL BACKGROUND

On October 18, 2016, Gordon Ranch LP ("Gordon Ranch") and Winecup Gamble, Inc. ("Winecup") entered into a Purchase and Sale Agreement for the conveyance of real property in Elko County, Nevada ("the October Agreement"). (October Agreement, ECF No. 36-1.) Then on December 21, 2016, the parties executed an amendment to the purchase agreement ("the Amendment").[1] (Amendment, ECF No. 36-2.) The subject property, commonly known as the

---

1  The generic term "the Agreement" will be used to refer collectively to the October Agreement and the Amendment.

Winecup Gamble Ranch ("the Property"), comprises approximately 247,500 deeded acres, rights to federal grazing permits covering approximately 558,080 acres, and Nevada state grazing rights covering approximately 142,800 acres. Pursuant to the Agreement, Gordon Ranch placed a total of $5 million in escrow as earnest money, in anticipation of a closing date "on or before April 15, 2017." (*See id.* at §§ 2, 3.)

On February 8, 2017, severe flooding on the Property caused an earthen dam (commonly known as "21 Mile Dam") to fail, and Gordon Ranch alleges the floodwaters damaged a material part of the Property. (3:17-cv-157 Compl. ¶ 29, ECF No. 1.) The flooding also gave rise to claims of liability from third parties, namely Union Pacific Railroad Company ("Union Pacific"), which sent two letters to Winecup in February 2017 indicating that the failure of two dams on the Property caused damage to Union Pacific tracks and other property. (*Id.*)

Following the flooding, Winecup indicated that it may not replace or repair certain destroyed portions of the Property, and may not rebuild certain infrastructure, including 21 Mile Dam. (*Id.* at ¶¶ 33–35.) On February 24, counsel for Gordon Ranch sent a letter to Winecup stating its position that Winecup bore the risk of loss and requesting an itemization and description of the damage and cost of repair. (*Id.* at ¶ 36.) On February 28, Clay Worden, representative of Winecup, emailed D.R. Horton of Gordon Ranch and informed him that, notwithstanding their attorneys' discussions regarding the flood damage, Winecup intended to proceed with closing on April 15. (*Id.* at ¶ 37.)

Having not received a formal response to its letter of February 24, and understanding that Winecup intended to move forward with the sale as originally planned, Gordon Ranch sent another letter through its attorney, along with a notice of default. (*Id.* at ¶ 39.) In its letter, Gordon Ranch asserted that Winecup's inability to "deliver at closing what was contracted for" constituted a material breach of the Agreement. (March 2 Letter, ECF No. 36-3.) Gordon Ranch

provided five days' notice of its termination of the Agreement. In the event Winecup failed to cure its alleged breach within five days' time, Gordon Ranch demanded a refund of its earnest money and "payment of its reasonable, actual out-of-pocket expenses incurred in connection with the Purchase Agreement (not to exceed $100,000)."

Winecup's counsel replied one week later. In its reply, Winecup argued that it had no contractual obligation to repair any damage to the Property, and thus did not breach the Agreement by indicating it may opt not to make certain repairs. (3:17-cv-157 March 9 Letter, ECF No. 1 at 60–62.) Winecup further asserted that, pursuant to the Amendment, the earnest money was nonrefundable under any circumstances. Therefore, although Gordon Ranch had a contractual right to terminate the Agreement as a result of the flooding, which Winecup acknowledged was a "casualty event," such termination nonetheless amounted to a forfeiture of the earnest money. Winecup informed Gordon Ranch that it would "proceed in its ranch operations and future sale efforts without further obligation to [Gordon Ranch]," and demanded that Gordon Ranch immediately instruct the title company to release the earnest money to Winecup. (3:17-cv-157 March 9 Letter 3, ECF No. 1 at 62.)

On March 9, 2017, the same day of its written response to Gordon Ranch's notice of default, Winecup filed a declaratory relief action in the Fourth Judicial District Court of Nevada, Elko County. On March 13, Gordon Ranch filed an essentially identical action in federal court. On March 16, Gordon Ranch removed Winecup's state-court case to this Court. On May 23, the Court consolidated the two cases under the above-entitled action. (Order, ECF No. 26.)

Both parties now move for judgment as a matter of law regarding which of them is entitled to the $5 million that sits in escrow. (Mot. Summ. J., ECF No. 33; Mot. J. Pleadings, ECF No. 36.)

///

## II.    LEGAL STANDARDS

### a.  Summary Judgment

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court uses a burden-shifting scheme. The moving party must first satisfy its initial burden. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citation and internal quotation marks omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24.

If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the

opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations unsupported by facts. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

At the summary judgment stage, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50. Notably, facts are only viewed in the light most favorable to the non-moving party where there is a genuine dispute about those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). That is, even where the underlying claim contains a reasonableness test, where a party's evidence is so clearly contradicted by the record as a whole that no reasonable jury could believe it, "a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

### b. Judgment on the Pleadings

Rule 12(c) of the Federal Rules of Civil Procedure provides: "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "For purposes of the motion, the allegations of the non-moving party must be accepted as true, while the allegations of the moving party which have been denied are assumed to be false." *Hal Roach Studios, Inc. v. Richard Feiner and Co.*, 896 F.2d 1542, 1550

1  (9th Cir. 1990). "Judgment on the pleadings is proper when the moving party clearly establishes

2  on the face of the pleadings that no material issue of fact remains to be resolved and that it is

3  entitled to judgment as a matter of law." *Id.*

4        The standards governing a Rule 12(c) motion for judgment on the pleadings are the same

5  as those governing a Rule 12(b)(6) motion to dismiss for failure to state a claim. *See Dworkin v.*

6  *Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989). "Generally, a district court may not

7  consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion. However,

8  material which is properly submitted as part of the complaint may be considered on a motion to

9  dismiss." *Hal Roach Studios*, 896 F.2d at 1555 n. 19 (citation omitted). Similarly, "documents

10 whose contents are alleged in a complaint and whose authenticity no party questions, but which

11 are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6)

12 motion to dismiss" without converting the motion to dismiss into a motion for summary

13 judgment. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994). Moreover, under Federal Rule of

14 Evidence 201, a court may take judicial notice of "matters of public record." *Mack v. S. Bay Beer*

15 *Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986). Otherwise, if the district court considers

16 materials outside of the pleadings, the motion to dismiss is converted into a motion for summary

17 judgment. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001).

18 **III.    ANALYSIS**

19      **a.  The October Agreement**

20       Under the October Agreement, Gordon Ranch was to purchase the Property from

21 Winecup, and the sale was to close on January 12, 2017. (October Agreement ¶ 4, ECF No. 36-

22 1.) Gordon Ranch agreed to place $1 million in escrow as earnest money. (*Id.* at ¶ 2.) There were

23 several situations contemplated by the October Agreement in which Gordon Ranch would be

24 entitled to a refund of the earnest money. For example, Gordon Ranch could terminate the

October Agreement and get a refund of the earnest money (1) at any time prior to Gordon Ranch's issuance of a Notice to Proceed (*Id.* at ¶ 6(d)), (2) in the event Winecup were unwilling or unable to cure Gordon Ranch's objections to any matter disclosed by the title commitment provided by the title company (*Id.* at ¶ 6(a)), or (3) in the event Winecup failed to meet any material obligation under the October Agreement (*Id.* at ¶ 8(a)). In fact, it is clear that the only circumstance permitting Winecup to keep the earnest money following a termination was a breach of the October Agreement by Gordon Ranch. (*Id.* at ¶ 9.)

Of course, most pertinent to this case are the risk-of-loss provisions of Section 14:

Risk of Loss. The risk of loss or damage to the Property (except loss or damage to the Fee Land caused by range fires, which are specifically excluded) and (except for any liability arising from Buyer's activities on the Property) all liability to third persons until the Close of Escrow shall be borne by Seller and subsequent to Close of Escrow shall be borne by Buyer. If, prior to Close of Escrow, the Property or any portion thereof is materially damaged as the result of fire or other casualty and Seller elects (which Seller may elect to do in its sole discretion) not to entirely restore the Property by the date scheduled for the Close of Escrow, or otherwise, Buyer shall have the option to:

(a) Accept title to the Property without any abatement of the Purchase Price whatsoever, in which event at the Close of Escrow all of Seller's insurance proceeds, if any, attributable to such casualty shall be assigned by Seller to Buyer, and any monies received from insurance by Seller at any time in connection with such casualty, shall be paid over to Buyer; or

(b) Terminate this Agreement, in which event all Earnest Money and interest accrued thereon shall be returned to Buyer by Escrow Agent, and neither party shall have any further liability or obligation to the other.

(*Id.* at ¶ 14.)

The parties agree that Section 14 is clear and unambiguous and that the Court can summarily determine and give effect to its plain meaning. The Court agrees as well. *See, e.g., Galardi v. Naples Polaris, LLC,* 301 P.3d 364, 367 (Nev. 2013); *Fed. Ins. Co. v. Coast Converters,* 339 P.3d 1281, 1285 (Nev. 2014). Here, the risk of loss was borne by Winecup at all times prior to the Close of Escrow, and therefore at all times relevant to this action. Further, NRS

113.040(a), which contains Nevada's default risk-of-loss rules and which Gordon Ranch relies on for support, has no relevance to this dispute. By that statute's own terms, it only applies where the contract in question does not expressly provide otherwise. Here there is a contract which expressly and unambiguously delineates the parties' rights and obligations in the event of any loss, damage, or liability to third parties. Thus, to determine those rights and obligations the Court need look no further than the contract.

### b. The Amendment

On December 21, 2016, the parties entered into an Amendment, modifying the October Agreement. Under the Amendment, the closing date was extended from January 12 to April 15, 2017. (Amendment ¶ 3, ECF No. 36-2.) The earnest money required by the October Agreement was amended to $5 million. The Amendment further provided: "Notwithstanding anything to the contrary in the [October] Agreement, the Earnest Money, as increased by the Additional Earnest Money, shall be nonrefundable under all circumstances other than a default by Seller." (*Id.* at ¶ 2.) Lastly, in pertinent part, Gordon Ranch agreed to waive "its right to terminate the Agreement under the Buyer's contingencies set forth in Section 6 of the [October] Agreement," and agreed that execution of the Amendment would constitute delivery of its Notice to Proceed. (*Id.* at ¶ 4.)

### c. Neither Party Breached the Agreement

As an initial matter, it is plain in the Agreement that if either party breaches the contract, the non-breaching party is entitled to the earnest money. Accordingly, this dispute would perhaps be more easily resolved if there had been breach. However, the Court finds that neither party defaulted with respect to any material obligation in the Agreement.

First, Winecup's refusal to repair the flood damage was not a breach under Section 14 of the October Agreement. Section 14 has a few layers, the first of which concerns liabilities to third parties arising during the escrow period. In such a case, the risk of loss is placed squarely

on the shoulders of Winecup: "[A]ll liability to third persons until Close of Escrow shall be borne by Seller and subsequent to Close of Escrow shall be borne by Buyer." (October Agreement ¶ 14.) Therefore, if Winecup had, for example, refused to resolve the claims of Union Pacific that arose from the flood, that action may well have constituted a breach or anticipatory breach of the Agreement. However, there is no indication in the record that Winecup ever indicated it would not accept responsibility for the third-party claims, and Gordon Ranch expressly terminated the Agreement based on Winecup's refusal to repair flood damage to the Property—not as a result of the claims by Union Pacific. (*See* March 2, 2017 Letter 2, ECF No. 36-3 ("Given the damage to the Property and the Seller's inability to even assess the full damage for months, my client has the right to terminate . . . .").)

The remaining layers concern the rights and obligations of the parties in the event of a loss or damage to the Property. Again, the risk of loss is borne generally by Winecup until the close of escrow. However, the true apportionment of risk is not quite as cut and dried as in the case of third-party liabilities. This is so because Section 14 specifically provides that after a casualty event, Winecup may elect, in its sole discretion, not to restore the Property to its pre-casualty condition. If that contingency were to arise—i.e., if Winecup chose not to restore the Property—Gordon Ranch had two options: broadly speaking, to go through with the purchase or terminate the Agreement. If Gordon Ranch opted to complete the purchase, it would not receive an abatement of the purchase price. However, it would be entitled to Winecup's insurance proceeds, if any, based on the casualty event. On the other hand, Gordon Ranch could opt to terminate the Agreement and receive a refund of the earnest money.

Here, following the flood, Winecup indicated to Gordon Ranch that it may elect not to repair the flood damage or rebuild certain lost infrastructure on the Property. On that basis, Gordon Ranch contends that Winecup breached Section 14 by unilaterally refusing to accept the

risk of loss at the time of the flood. But this conclusion is simply wrong. It cannot be said that Winecup violated the Agreement merely by exercising its right not to restore the Property—a right expressly granted by the Agreement.

Second, Gordon Ranch asserts that Winecup defaulted under Paragraph 6(c) of the October Agreement by refusing to deliver the Property free of all material adverse changes. This argument fails for two reasons. First, Gordon Ranch waived its rights under Section 6 by executing the Amendment. The introductory language of Section 6 reads: "Buyer's obligation to consummate the transaction contemplated hereby or to fulfill its obligations under this Agreement is subject to satisfaction of the following conditions precedent (which Buyer may elect to waive, in whole or in part, in its sole discretion) . . . ." One such condition provides that "Buyer's obligation to close the purchase of the Property is expressly conditioned upon there having been no material adverse change in the physical condition of the Property following the issuance of Buyer's Notice to Proceed (as defined in Subparagraph 6(d))." (October Agreement ¶ 6(c).) However, Section 4 of the Amendment provides: "Buyer waives its right to terminate the Agreement under the Buyer's Contingencies set forth in Section 6 of the Agreement . . . ."

Gordon Ranch proposes a strained reading of this part of the Amendment, contending that it waived certain of the conditions precedent in Section 6 but not all of them. However, this contention is contrary to the plain language of the Amendment. The waiver of Section 6 is unqualified and unequivocal. Accordingly, in executing the Amendment, Gordon Ranch voluntarily abandoned its right to back out of the purchase based on a failure of any of the conditions precedent listed in Section 6. Gordon Ranch could have insisted on additional language in the Amendment in order to limit its waiver. It didn't, however, and the Court must give effect to the plain language of the Agreement, which includes a broad and unqualified waiver of the Buyer's Contingencies.

Gordon Ranch's Section 6 argument also fails because, even without the waiver, a material adverse change in the Property does not equate to a breach by Winecup. Section 6 is merely a collection of conditions precedent, the failure of which would excuse Gordon Ranch's non-performance. Section 6 does not impose any affirmative obligation on Winecup to prevent material adverse changes from occurring, or to cure material adverse changes prior to closing. Indeed, such a reading of Section 6 is entirely inconsistent with Section 14, which expressly permits Winecup to elect not to restore the Property following a casualty event causing material damage. In contract interpretation, "[e]very word must be given effect if at all possible." *Royal Indem. Co. v. Special Serv. Supply Co.*, 413 P.2d 500, 502 (Nev. 1966). Moreover, "a court should not interpret a contract so as to make meaningless its provisions." *Bielar v. Washoe Health Sys., Inc.*, 306 P.3d 360, 364 (Nev. 2013). Accordingly, setting aside the issue of waiver, the only reasonable interpretation of the Agreement is that a material adverse change to the Property would excuse Gordon Ranch's refusal to consummate the transaction but would not necessarily constitute a breach by Winecup. And given that the alleged material adverse change was caused by a casualty event, both parties' rights and options are plainly spelled out in Section 14. Under that Section, Winecup had the express option not to cure the alleged material adverse change, and thus could not have breached the Agreement by exercising that option.

Next, Gordon Ranch asserts that Winecup defaulted when Union Pacific raised its claims of liability based on the flood damage, because Winecup had previously provided a warranty—in Paragraph 10(a) of the October Agreement—that there were no "claims, actions, suits, condemnation actions or other proceedings pending or threatened by any entity against Seller or the Property." Again, this was not a breach, precisely for the reasons given in Winecup's response to Gordon Ranch's motion. (Resp. 8–10, ECF No. 44.) First, the October Agreement provides that the foregoing warranty was "true and correct on the date hereof, will be true and

Gordon Ranch's Section 6 argument also fails because, even without the waiver, a material adverse change in the Property does not equate to a breach by Winecup. Section 6 is merely a collection of conditions precedent, the failure of which would excuse Gordon Ranch's non-performance. Section 6 does not impose any affirmative obligation on Winecup to prevent material adverse changes from occurring, or to cure material adverse changes prior to closing. Indeed, such a reading of Section 6 is entirely inconsistent with Section 14, which expressly permits Winecup to elect not to restore the Property following a casualty event causing material damage. In contract interpretation, "[e]very word must be given effect if at all possible." *Royal Indem. Co. v. Special Serv. Supply Co.*, 413 P.2d 500, 502 (Nev. 1966). Moreover, "a court should not interpret a contract so as to make meaningless its provisions." *Bielar v. Washoe Health Sys., Inc.*, 306 P.3d 360, 364 (Nev. 2013). Accordingly, setting aside the issue of waiver, the only reasonable interpretation of the Agreement is that a material adverse change to the Property would excuse Gordon Ranch's refusal to consummate the transaction but would not necessarily constitute a breach by Winecup. And given that the alleged material adverse change was caused by a casualty event, both parties' rights and options are plainly spelled out in Section 14. Under that Section, Winecup had the express option not to cure the alleged material adverse change, and thus could not have breached the Agreement by exercising that option.

Next, Gordon Ranch asserts that Winecup defaulted when Union Pacific raised its claims of liability based on the flood damage, because Winecup had previously provided a warranty—in Paragraph 10(a) of the October Agreement—that there were no "claims, actions, suits, condemnation actions or other proceedings pending or threatened by any entity against Seller or the Property." Again, this was not a breach, precisely for the reasons given in Winecup's response to Gordon Ranch's motion. (Resp. 8–10, ECF No. 44.) First, the October Agreement provides that the foregoing warranty was "true and correct on the date hereof, will be true and

Gordon Ranch's Section 6 argument also fails because, even without the waiver, a material adverse change in the Property does not equate to a breach by Winecup. Section 6 is merely a collection of conditions precedent, the failure of which would excuse Gordon Ranch's non-performance. Section 6 does not impose any affirmative obligation on Winecup to prevent material adverse changes from occurring, or to cure material adverse changes prior to closing. Indeed, such a reading of Section 6 is entirely inconsistent with Section 14, which expressly permits Winecup to elect not to restore the Property following a casualty event causing material damage. In contract interpretation, "[e]very word must be given effect if at all possible." *Royal Indem. Co. v. Special Serv. Supply Co.*, 413 P.2d 500, 502 (Nev. 1966). Moreover, "a court should not interpret a contract so as to make meaningless its provisions." *Bielar v. Washoe Health Sys., Inc.*, 306 P.3d 360, 364 (Nev. 2013). Accordingly, setting aside the issue of waiver, the only reasonable interpretation of the Agreement is that a material adverse change to the Property would excuse Gordon Ranch's refusal to consummate the transaction but would not necessarily constitute a breach by Winecup. And given that the alleged material adverse change was caused by a casualty event, both parties' rights and options are plainly spelled out in Section 14. Under that Section, Winecup had the express option not to cure the alleged material adverse change, and thus could not have breached the Agreement by exercising that option.

Next, Gordon Ranch asserts that Winecup defaulted when Union Pacific raised its claims of liability based on the flood damage, because Winecup had previously provided a warranty—in Paragraph 10(a) of the October Agreement—that there were no "claims, actions, suits, condemnation actions or other proceedings pending or threatened by any entity against Seller or the Property." Again, this was not a breach, precisely for the reasons given in Winecup's response to Gordon Ranch's motion. (Resp. 8–10, ECF No. 44.) First, the October Agreement provides that the foregoing warranty was "true and correct on the date hereof, will be true and

correct as of the date of Close of Escrow, and shall survive the Close of Escrow for two years."
There is no claim that the warranty was untrue as of the date the October Agreement was
executed, and Gordon Ranch unilaterally terminated the Agreement prior to the close of escrow,
so the warranty could not have been untrue as of the closing date, which never arrived. Thus, the
warranty was never breached. Moreover, Winecup did not default under Section 10 because it
was not provided notice and an opportunity to cure the alleged breach of warranty as required by
Paragraph 8(a) of the October Agreement. In reality, Gordon Ranch's termination of the
Agreement arose under Section 14, not Section 10.[2] And without any opportunity to cure its
alleged breach of warranty under Section 10, Winecup cannot be said to have defaulted under
that Section.

Lastly, both parties argue that the other breached the Agreement by refusing to release
the earnest money. However, as noted by Winecup's counsel at oral argument, this contention is
circular. Both parties claimed they were entitled to the earnest money under the plain terms of
the Agreement, and both parties petitioned a court for declaratory relief on their claim. This is
not a case where one party failed to perform some clear material obligation imposed by a
contract. Rather, the parties merely disagreed on the correct reading of the contract and wished to
submit their dispute to a court for an authoritative interpretation. There was no breach of the
Agreement in this case; there was simply a no-fault termination based on a casualty event.

///

---

2 Nor was the termination proper under Section 8 of the October Agreement, which was the
Section cited by Gordon Ranch in its notice of default dated March 2, 2017. (March 2, 2017
Letter, ECF No. 36-3.) Termination under Section 8 is applicable only where a party has failed to
meet a material obligation under the Agreement. As explained above, however, Winecup did not
breach the Agreement. Rather, Gordon Ranch's termination was justified only pursuant to the
risk-of-loss provisions of Section 14. In contrast to Section 8, termination under Section 14 does
not require notice and an opportunity to cure, and does not permit Gordon Ranch to recoup its
reasonable, actual out-of-pocket expenses in connection with the Agreement.

### d. The Earnest Money

Having decided that the Agreement was terminated based on a casualty event pursuant to Section 14 of the October Agreement, and that neither party breached the Agreement, the Court now turns to the question of whether the Amendment was sufficient to modify Section 14 such that Gordon Ranch would not be entitled to a refund of the earnest money under the circumstances presented here. In this regard, Winecup's position is straightforward: The Amendment provides that "[n]otwithstanding anything to the contrary in the [October] Agreement, the Earnest Money, as increased by the Additional Earnest Money, shall be nonrefundable under all circumstances other than a default by Seller." (Amendment § 2, ECF No. 36-2.) Section 14 of the October Agreement contains a "contrary" provision, stating that Gordon Ranch may terminate the Agreement and get its earnest money back should Winecup elect not to restore the Property after a casualty event. Therefore, the Amendment modified Section 14 so that Gordon Ranch retained the right to terminate the Agreement, but would forfeit the earnest money by doing so.

The Nevada Supreme Court has stated that "[c]ontract interpretation strives to discern and give effect to the parties' intended meaning." *Galardi*, 301 P.3d at 367. Accordingly, it is axiomatic that a contractual amendment can only modify the preexisting contract to the extent the parties actually intended to do so. Here, it is the Court's task to discern, based on the language of the Agreement, whether the parties intended for Section 2 of the Amendment to alter the risk-of-loss provisions in Section 14 of the October Agreement. For the following reasons, the Court finds this was not the parties' intent, and the risk-of-loss provisions remained unchanged notwithstanding the Amendment.

First, under the October Agreement, Winecup bore the risk of loss prior to the close of escrow, and the Amendment did not address nor expressly purport to reapportion the risk of loss.

1   Neither party can say that casualty risk was specifically contemplated by the Amendment, and

2   there could be many reasons on both sides for executing the Amendment, other than

3   reapportioning risk. Overall, the Amendment lacks clear indicia of an intent that the earnest

4   money would become truly non-refundable. Notably, a seller in Winecup's shoes, faced with a

5   buyer's request to postpone the closing date, might typically bargain for an increase of the

6   earnest money, as well as a contemporaneous agreement that the earnest money be immediately

7   released to the seller, in exchange for the extension. Here, there was no such release; the earnest

8   money remained in escrow.

9       Second, the specific risk-of-loss provisions of Section 14 must be given precedence over

10  the broad, general terms of the Amendment. Section 14 sets up a detailed scheme for

11  apportioning the risk of loss, while the Amendment's sweeping, non-specific language broadly

12  purports to modify "anything to the contrary" in the October Agreement. As a basic rule of

13  contract interpretation, "specific terms and exact terms are given greater weight than general

14  language." Restatement (Second) of Contracts § 203(c) (1981); *see also Campbell v. Nevada*

15  *Prop. 1 LLC*, No. 2:10-cv-02169, 2013 WL 6118622, at *2 (D. Nev. Nov. 20, 2013) (Gordon,

16  J.), aff'd, 672 F. App'x 698 (9th Cir. 2016).

17      Lastly, the risk-of-loss scheme established by Section 14, with its internal logic, strongly

18  militates against a finding that those provisions could be modified by anything less than an

19  explicit reference. Under Section 14, the risk of loss is Winecup's. However, following a

20  casualty event, Winecup may elect not to restore the Property to its pre-casualty condition.

21  Winecup's election not to restore the Property then triggers the availability of two options to

22  Gordon Ranch. First, Gordon Ranch can go through with the purchase at full price and lay claim

23  to any available insurance proceeds. Alternatively, Gordon Ranch can terminate the Agreement

24  and receive a refund of the earnest money. The option to terminate the Agreement and get a

1   refund under Section 14 is not generally available to Gordon Ranch, except in the case where

2   Winecup first opts not to restore the Property. The language of the Amendment does not

3   suggest—and neither party argues—that the Amendment was intended in any way to modify the

4   underlying conditional nature or effect of the risk-of-loss scheme. Winecup merely argues that

5   Gordon Ranch's conditional option to terminate the Agreement with a refund, became a

6   conditional option to terminate without a refund. But this would have a substantial impact on the

7   apportionment of the risk of loss, effectively shifting a significant share of the risk to Gordon

8   Ranch. Such a dramatic revision of the risk-of-loss scheme is not supported by the broad,

9   scattershot language of the Amendment.

10         Therefore, the Court finds that in executing the Amendment, it was not the parties' intent

11  to modify the risk-of-loss provisions of Section 14 of the October Agreement. Accordingly,

12  because Winecup expressed its intent not to restore the Property to its pre-casualty state, Gordon

13  Ranch was entitled to terminate the Agreement pursuant to Section 14, and is now entitled to a

14  refund of its earnest money.

15  / / /

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

**CONCLUSION**

IT IS HEREBY ORDERED that Gordon Ranch's Motion for Judgment on the Pleadings (ECF Nos. 36, 37) is GRANTED. Gordon Ranch shall submit a proposed form of judgment within fourteen (14) days of this Order.

IT IS FURTHER ORDERED that Winecup's Motion for Summary Judgment (ECF No. 33) is DENIED.

IT IS FURTHER ORDERED that the Motions to Seal (ECF Nos. 35, 45) are GRANTED. The relevant documents have already been filed under seal, and no further action is required of the Clerk of the Court.

Each party shall bear its own fees and expenses related to the litigation of this matter.

IT IS SO ORDERED.


_____
ROBERT C. JONES
United States District Judge

Dated: August 30, 2017.